**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SOUTHWEST KEY PROGRAMS, INC.** | § | **Civil Action No. 4:18-cv-3289** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **CITY OF HOUSTON** | § | |
| | § | **VIOLATION OF THE FAIR** |
| | § | **EMPLOYMENT AND HOUSING** |
| | § | **ACT PURSUANT TO** |
| *Defendant.* | § | **42 U.S.C. § 3601 et seq.** |

---

### ORIGINAL COMPLAINT

1.      Plaintiff Southwest Key Programs, Inc. ("Southwest Key" or "Plaintiff"), a Texas non-profit corporation, brings this fair housing action and other claims to challenge the City of Houston's ("City") discriminatory and unconstitutional obstruction of Southwest Key's good faith efforts to operate an immigrant youth housing shelter within the City's boundaries. Southwest Key seeks declaratory, injunctive, and monetary relief against the City for violations of the Federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*; the Texas Fair Housing Act, Texas Property Code §301 001 *et. seq.*; the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution; and the Supremacy Clause of the United States Constitution.

## I.   INTRODUCTION

2.      The federal government has a statutory duty to provide housing for unaccompanied children arriving in the United States from countries such as El Salvador, Honduras, and Guatemala. In accordance with federal law, Southwest Key contracts with the federal government to discharge that duty. Southwest Key currently provides such housing for minors at 26 licensed immigrant youth shelters in Texas, Arizona and California, including three operating shelter

locations in Houston. There are other similar immigrant youth shelters in Houston operated by entities other than Southwest Key, such as Catholic Charities.

3.       Southwest Key sought to open a fourth shelter in Houston to meet increasing demand from the federal government. A search of available properties identified a suitable site located at 419 Emancipation Avenue, Houston, TX 77003 (the "Casa Sunzal Shelter"). That site has a long history of use as a shelter facility which makes it uniquely suitable for Southwest Key's and the government's purposes. From approximately 1997 to 2016, the Star of Hope operated a homeless shelter at that site which counted children among its residents. In 2017 and 2018, the City operated a shelter there for families (including children) displaced by Hurricane Harvey.

4.       Southwest Key executed a ten-year lease for the Casa Sunzal Shelter in May 2018 and applied for necessary permits from the City.

5.       On June 8, 2018, the City issued a Certificate of Occupancy for the Casa Sunzal Shelter authorizing its use as a "SHELTER/DORMITORY" with a Residential use classification per the City's building code.

6.       On June 14, 2018, the Casa Sunzal Shelter underwent a fire safety inspection by the City's Fire Marshal's Office and received a "Safety Survey Approval" and fire permits. On June 15, 2018, The City's Department of Public Works (the same agency that issued the Certificate of Occupancy) reported to the press, through its spokesperson: "As far as the City is concerned, [Southwest Key] has everything they need to operate." On the same date, the City's spokesman stated that the Casa Sunzal Shelter "is privately owned and up to date on its permits."

7.       Soon after, the City changed its position and engaged in a concerted course of action to prevent Southwest Key from opening and operating the Casa Sunzal Shelter and from operating its other facilities by, among other actions: invalidating previously issued permits without

following due process requirements; unjustifiably refusing to conduct necessary inspections or issue necessary permits; manipulating the land use and permitting process; interfering with the issuance of necessary permits by state agencies; conducting harassing inspections of other Southwest Key shelter facilities; and generally engaging in a campaign of obstruction to prevent Southwest Key from providing any housing to unaccompanied children in Houston. The City's actions were motivated by discrimination because of race, color, national origin, ancestry, alienage, or immigration status, or hostility to federal policy, or for political gain, or some combination of these factors. The City's actions also have an unjustified disparate impact based on race, color, national origin, or ancestry. As a result, the City has violated federal and state fair housing laws as well as equal protection, due process, and federal supremacy principles. This Court's intervention is necessary to remedy those violations.

## II.  PARTIES

8.    Plaintiff Southwest Key is a nonprofit corporation organized under the laws of the State of Texas with its principal place of business in Texas. Southwest Key is the largest provider of licensed residential care services for unaccompanied immigrant children in the United States. The facilities that Southwest Key operates and seeks to operate constitute dwellings within the meaning of the Fair Housing Act (FHA), 42 U.S.C. § 3602(b), and the meaning of the Texas Fair Housing Act (THA), Texas Property Code §301.003(8). Southwest Key is an "aggrieved person" for purposes of 42 U.S.C. § 3613(a)(1)(A) and Texas Property Code §301.151(a).

9.    Defendant City of Houston is a municipal corporation, established and organized under the laws of the State of Texas. The City of Houston is a person subject to 42 U.S.C. § 1983, 42 U.S.C § 3602(d) and Texas Property Code §301.003(12). At all relevant times described herein,

the City acted through its agents, officers, and employees. The City may be served with process by service to Anna Russell, City Secretary, City of Houston, 901 Bagby, Houston, Texas 77002.

## III. JURISDICTION AND VENUE

10.     The Court has original jurisdiction pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331, 1343, because Plaintiff states claims arising under the laws of the United States, specifically the Fair Housing Act, the Equal Protection Clause, the Due Process Clause and the Supremacy Clause.

11.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 to hear and determine Plaintiff's state law claims because those claims are related to Plaintiff's federal law claims and arise out of a common nucleus of related facts. Plaintiff's federal and state law claims form part of the same case or controversy under Article III of the United States Constitution.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant and its officers are subject to personal jurisdiction within the Southern District of Texas and because the events which give rise to this action took place within, and the subject properties are located within, the Southern District of Texas.

## IV. FACTUAL BACKGROUND

### A. Housing for Unaccompanied Children.

13.     Federal law entrusts the care and custody of "unaccompanied alien children"[1] to the United States Department of Health and Human Services, deliberately treating these

---

[1] "Unaccompanied alien children," also referred to as "unaccompanied children," are defined as children under 18 who have no parent or legal guardian in the United States available to provide care and physical custody and who lack lawful immigration status. 6 U.S.C. § 279(g)(2).

unaccompanied children differently from adults and requiring that they be housed largely in group settings.[2]

14.     These children leave their homes and travel north in the hope of gaining entry to the United States, making a perilous journey to escape difficult circumstances in their home countries. Regardless of how they enter the United States, unaccompanied children enjoy significant rights under federal law that are not available to many other immigrants.

15.     The Homeland Security Act of 2002 abolished the former Immigration and Naturalization Service and transferred most of its immigration benefits and law enforcement functions to the new Department of Homeland Security. However, Congress transferred the care of unaccompanied children to the Office of Refugee Resettlement ("ORR"), within the Department of Health and Human Services. 6 U.S.C. §279(a). Among other things, Congress charged ORR with "ensuring that the interests of the child are considered in decisions and actions relating to [his or her] care and custody," with "making placement determinations," with "identifying qualified individuals, entities, and facilities to house unaccompanied alien children," and with "overseeing the infrastructure and personnel of facilities in which unaccompanied alien children reside." 6 U.S.C. §279 (b)(1)(B), (C), (F), and (G).

16.     Section 235 of the William Wilberforce Trafficking Victims Protection Act 2008, Pub. L. No. 110-457, 122 Stat. 5044 (2008), *codified as amended at* 8 U.S.C. §1232, required unaccompanied children "in Department of Health and Human Services custody" to "be promptly placed in the least restrictive setting that is the best interest of the child," subject to certain considerations. 8 U.S.C. §1232(c)(2)(A). Unaccompanied children may not be placed "in a secure

---

[2] Under a settlement agreement, unaccompanied minors are required to be housed "in licensed, non-secure facilities that meet certain standards." *Flores v. Lynch,* 828 F.3d 898, 901 (9th Cir. 2016)

facility absent a determination that the child poses a danger to self or others or has been charged with . . . criminal offense."

17.     To the extent not otherwise superseded by statute, ORR is also bound by a 1997 consent decree (the "*Flores* Settlement"), which "sets out nationwide policy for the detention, release, and treatment of minors in [its] custody . . . ." *See Flores v. Lynch*, 838 F.3d 898 (9th Cir. 2016) (recognizing continuing applicability of *Flores* Settlement to unaccompanied minor). The *Flores* Settlement requires ORR to "treat . . . all minors in its custody with dignity, respect, and special concern for their vulnerability as minors," and, to place them "in the least restrictive setting appropriate to the minor's age and special needs." *Flores* Settlement, ¶ 11. It noted that the federal government "usually houses persons under the age of 18 in an open setting, such as a foster or group home, and **not in detention facilities**." *Flores* Settlement at p. 45 (emphasis added). Thus, subject to limited exceptions, while in ORR's "legal custody," an unaccompanied child "shall be placed temporarily in a licensed program," defined as one "that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes . . . ." *Id*. ¶¶ 6, 19. Under this framework, unaccompanied children in ORR's custody are cared for through a network of state-licensed ORR-funded care providers, which are residential care providers that provide temporary housing and other services "in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232 (c)(2)(A). The vast majority are placed in shelter care in residential care facilities such as the Casa Sunzal Shelter.

### B.  <u>Permitting and Licensing Requirements</u>

#### *City of Houston*

18.     In order for a building or structure to operate in the City, it must be granted various permits by the City. These include a Certificate of Occupancy issued by the City Permitting Center.

19.     A Certificate of Occupancy, when granted, identifies the "occupancy use" and "group" of the structure pursuant to the 2012 International Building Code, adopted, as amended, by the City (the "Building Code").

20.     The Building Code distinguishes "Institutional Group I" buildings and structures from "Residential Group R" buildings and structures. *See* Building Code Sections 308, 310. These classifications are then further broken down into sub-categories, depending on the exact nature of the use of the facility.

21.     Critically, except in the (inapplicable) child day care classification, the age of the occupants does not determine the classification of a facility as either an Institutional or Residential use facility. The capacity of the occupants for self-preservation is relevant, but only in conjunction with the type of security measures or restrictions on the occupants' liberty in effect at the facility.

22.     The use classification given to a facility is of significant import, as the structural and other regulations with which the facility must comply vary depending on the use classification of the building.

### *State of Texas*

23.     In addition to a City Certificate of Occupancy, a youth shelter facility must receive an operational license from the State of Texas. Facilities such as the Casa Sunzal Shelter require a General Residential Operation (GRO) license to operate as a shelter for children. The GRO license is issued under the direction of the Texas Department of Family and Protective Services (DFPS). As part of the GRO licensing process, DFPS requires license applicants to be in compliance with required city permitting.

C.  **Southwest Key Programs Provide Housing and Other Services for Unaccompanied Children in Fulfillment of Federal Law and Policy.**

24.     Southwest Key is a state-licensed, ORR-funded, residential care provider that provides group homes along with support services for unaccompanied children. It is the largest provider of licensed residential services for unaccompanied children in the United States. It has been providing these services under contract with ORR (or its predecessors) for over 20 years. ORR places unaccompanied children with Southwest Key on an ongoing basis, and would place unaccompanied children with Southwest Key at the Casa Sunzal Shelter if the City would allow Southwest Key to open and operate that facility for them.

25.     Southwest Key plays no role in arresting or detaining immigrants. It does not separate children from their parents, nor does it make or seek to influence any decision about the immigration status of any individual.

26.     Southwest Key currently operates 26 shelters in the United States providing housing to approximately 23,000 children per year. The residents of Southwest Key facilities are almost exclusively Latinx children from Central America. In fiscal year 2014, for example, 95.5% of children residing in Southwest Key facilities were Latinxs from Guatemala, Honduras, and El Salvador, and the numbers are similar today.

27.     Southwest Key's mission is to provide residential, educational, health, and other humanitarian services to unaccompanied immigrant children in a nurturing environment. Its programs encourage the development of personal and academic skills and offer an array of services, including case management, legal, medical, dental, educational, vocational, recreational, and religious services. Southwest Key's resident children do not attend local schools but instead receive instruction where they reside or in special facilities at federal expense.

28.     Children live at Southwest Key facilities until arrangements are made either to reunite them with relatives living in the United States or to place them in appropriate foster care or other living arrangements pending the resolution of immigration proceedings.

29.     Unaccompanied children live in Southwest Key housing for an average of 58 days, with some residing there for longer periods of time.

30.     While children reside in a Southwest Key dwelling, it is their home. They eat meals and participate in educational and recreational activities together at the Southwest Key dwelling. They sleep in the same bed and room each night. They may personalize their rooms and leave their belongings there. They treat the Southwest Key residence as their home and view it as a place to return to from field trips or other excursions while living there. While residing in a Southwest Key dwelling, the children have no place else to live.

31.     Southwest Key strives to provide best-in-class services for its residents, and has received numerous awards and accolades for the way it looks after the children in its care.

32.     Southwest Key receives children from ORR only after the government has determined that they "are not likely to pose a danger to themselves or others." 6 U.S.C. § 279(b)(2)(A)(iii). In any event, Southwest Key provides training for its staff on maintaining a safe, secure, and appropriate environment. Children housed with Southwest Key are constantly and properly supervised during all activities.

33.     The Southwest Key facilities, including the Casa Sunzal Shelter, are not "detention centers" or "jails." They are groups homes or shelters. There is no punitive purpose associated with placement of the children in the shelters. The children have unrestricted egress to the street. The children are not locked in their rooms or otherwise restrained, at night or at other times. The buildings and campuses are not locked down to prevent egress. There is no remote controlled-

release of means of egress. While security is present at Southwest Key facilities, its function is to limit entrance into, not egress from, the facilities. There are no security measures not under the children's control which renders them incapable of self-preservation. While children are verbally discouraged from leaving, as with a school setting, children are not physically restrained if they try to leave the campus.

34.     ORR distinguishes Shelter Care, of the sort provided at the Casa Sunzal Shelter, from Staff Secure Care and Secure Care.[3] In Staff Secure Care and Secure Care, stricter security measures are maintained than in a Shelter in order to control disruptive behavior and to prevent escape.[4] As explained by ORR, a Staff Secure Care provider may have a secure perimeter with a no-climb fence, and secure care providers may have a physically secure structure and may have multiple locked pods or cell units.[5] In contrast, a shelter does not have these structural impediments on egress.

35.     Southwest Key's programs are regulated and monitored by federal agencies.

### D. Southwest Key Prepares the Casa Sunzal Shelter to Provide Housing for Unaccompanied Children.

36.     Consistent with long-term trends of increasing migration of unaccompanied children from Central America, additional housing for unaccompanied children is needed. Southwest Key seeks to open new housing for such children at the Casa Sunzal Shelter in Houston to meet this need.

---

[3] *See* Children Entering the United States Unaccompanied: Guide to Terms, March 21, 2016, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms (last visited September 14, 2018).
[4] *Id.*
[5] *Id.*

*Casa Sunzal Shelter's Prior Use*

37.     The Casa Sunzal Shelter has long been used for those otherwise without a home. From approximately 1997 to 2016, the Star of Hope operated a shelter for women and children in the Casa Sunzal Shelter. In 2017 and early 2018, the City provided housing to families (including children) displaced from their homes by Hurricane Harvey in the Casa Sunzal Shelter. This prior use, including housing children, was permitted by the City via a Certificate of Occupancy under a "Residential" use classification pursuant to Section 310.1 of the Building Code.

38.     The Casa Sunzal Shelter's prior use for group housing made it well-suited for Southwest Key's mission of providing housing to unaccompanied children. The facility offers dormitory-style living arrangements, large indoor and outdoor gathering and recreational spaces, educational facilities, counseling and administrative areas, large kitchen and dining areas, and the ancillary systems necessary to support these functions.

*Southwest Key Leases the Casa Sunzal Shelter and Prepares it for Operation*

39.     On May 25, 2018, Southwest Key executed a lease agreement for the Casa Sunzal Shelter (the "Lease"). The Lease has a term of ten (10) years. The Lease requires Southwest Key to pay base rent at rate of $130,000 per month and additional rental costs of $40,000 per month.[6] The Lease subjects Southwest Key to substantial financial liability likely exceeding $3 million in the event it is unable to perform its obligations under the Lease.[7]

40.     After execution of the Lease, Southwest Key prepared the Casa Sunzal Shelter for the housing of the children. It purchased and installed furnishings and equipment, brought the

---

[6] Additional rent consists of real estate taxes and property insurance.
[7] The earliest Southwest Key may terminate the lease is after two years with an early termination fee of $390,000.00.

building into compliance with city code, took safety and security measures, and conducted other associated and necessary work.

41.     Southwest Key's contractual arrangements with the federal government require it to provide certain levels of service to the children and maintain certain staffing ratios. To comply with its contractual obligations and provide the level of services it expects to provide, Southwest Key has hired employees to work at and staff the Casa Sunzal Shelter.

42.     To date, Southwest Key has incurred in excess of $3 million in expenses to prepare and staff the Casa Sunzal Shelter. The estimated future liability to Southwest Key associated with this project is $5.3 million.

*The City Issues Permits for the Use of the Casa Sunzal Shelter*

43.     Following an inspection of the Casa Sunzal Shelter, on or around June 8, 2018, the City issued a Certificate of Occupancy authorizing use as a "SHELTER/DORMITORY" under a Residential use classification pursuant to the Building Code. On June 8, the City also issued a separate Life Safety Compliance Certificate for the Casa Sunzal Shelter educational facilities authorizing their use for day care and educational purposes, with an "Educational Use" classification.

44.     On June 14, 2018, the Casa Sunzal Shelter underwent a fire safety inspection by the City's Fire Marshal's Office and received a "Safety Survey Approval." On or around the same date the City's fire department issued two fire permits for the buildings comprising the Casa Sunzal Shelter.

45.     The following day, the City publicly declared that the Casa Sunzal Shelter was fully-permitted by the City. In a June 15, 2018 news report in the Houston Chronicle,[8] The City's Department of Public Works (the same agency that issued the Certificate of Occupancy) stated to the press, through its spokesperson: "As far as the City is concerned, [Southwest Key] has everything they need to operate." The Public Works spokesperson also acknowledged the Casa Sunzal Shelter underwent a full occupancy inspection, and a certificate of occupancy was issued. On the same date, the City's spokesman informed the press that the Casa Sunzal Shelter "is privately owned and up to date on its permits."

46.     Based on the permits issued and statements made, the City undoubtedly understood the Casa Sunzal Shelter was to be utilized for the housing of children, and agreed that Southwest Key had "everything they need to operate" the facility for that use. It was only after learning of the national origin of the children the Casa Sunzal Shelter would house, and the associated political maelstrom, that the City embarked on its wrongful course of conduct.

*Southwest Key Also Applies for the State Permits Necessary to Operate the Casa Sunzal Shelter*

47.     In addition to the various City licenses obtained for Casa Sunzal, Southwest Key also applied for the necessary GRO State permit. On May 30, 2018, Southwest Key submitted an application to the State of Texas for a GRO license to operate the Casa Sunzal Shelter. On June 12, 2018, the state requested additional information regarding the use of the facility. Southwest Key provided additional information to the State on June 15, 2018. At that time, the application was accepted by the state and initial inspection of the Casa Sunzal Shelter was conducted on July 12, 2018, to ensure that the facility met the State's standards. Two minor plumbing issues were

---

[8] Immigrant Children's Shelter Considered for Downtown Houston, June 18, 2018, available at: https://www.houstonchronicle.com/news/houston-texas/houston/article/Immigrant-children-s-shelter-considered-for-12999084.php?cmpid=gsa-chron-result (last visited September, 2018).

noted during the inspection. These deficiencies were corrected, and the corrections were submitted to state licensing on July 17, 2018. On August 2, 2018, the State conducted a follow-up inspection and the Casa Sunzal Shelter was found to be in compliance with all State standards.

### E. The City Reverses Course and Blocks Southwest Key's Use of Casa Sunzal Facility.

48.     In a June 16, 2018, interview with KTRK television regarding the Casa Sunzal Shelter,[9] the City's mayor, Sylvester Turner, stated "[w]e started getting this buzz in the last week or so." Apparently, the City's "buzz" was caused by the federal government's family separation policy. Turner also claimed "[n]o one ever said [the Casa Sunzal Shelter] was being leased to a tenant that was going to house children that were separated from their parents…[w]hen it comes to separating children from their families, I can't support it." Also on June 16, 2018, Turner was interviewed by KPRC television and is reported to have said that he did not want the Casa Sunzal shelter in Houston, "I do not agree with it." Turner's expression of concern, as it relates to the Casa Sunzal Shelter, is misplaced. Few, if any, of the children to be housed at the Casa Sunzal Shelter have been separated from their families because of the federal government's family separation polices. Indeed, that policy ended on June 20, 2018. The vast majority of residents at Southwest Key's facilities arrived at the border unaccompanied by a parent or guardian.

49.     Turner held a news conference on June 19, 2018,[10] at which he stated the City had been attempting to lease the Casa Sunzal Shelter facility for its own use as a shelter for the City's homeless population. Apparently the City finds the Casa Sunzal Shelter adequate for housing large numbers of persons, so long as they are Houston residents and not foreign nationals. Turner

---

[9] "I can't support it": Mayor Turner Rejects Idea of Child Immigration Detention Center in Houston, June 16, 2018, available at: https://abc13.com/politics/i-cant-support-it-turner-rejects-child-immigration-detention-center/3610952/ (last visited September 14, 2018).

[10] Available at https://www.youtube.com/watch?v=deARffVx4Ng (last visited August 23, 2018).

described the Casa Sunzal Shelter as an "excellent, excellent location" for a shelter facility. Turner then equated the federal government's immigration policies with Southwest Key's planned opening of the Casa Sunzal Shelter, ignoring Southwest Key's lack of policy-making role and ignoring that the anticipated residents of the Casa Sunzal Shelter would not be children separated from their parents by the U.S. Government. Turner—who, as Mayor is not typically involved in building code classification of buildings—made clear that his involvement in the process was triggered by political concerns over federal government policies. He stated:

> I do not question [Southwest Key's] intent. I don't question that…[B]ut I also made it clear to Southwest Key that I do not support this facility being used for … this purpose …
> ….
> I do not want the City to be an enabler in this process … I do not want the City to participate in this process. I do not want our facilities and property owners to participate in this process … We draw the line. Lastly … the fire department is yet to inspect this facility, the health department has yet to provide a food permit or shelter permit to this facility.[11]

50.    Turner's statements regarding the fire department permit and inspection were both wrong and contrary to the City's own prior media statements. Turner then went on to say, "As far as I know, the State has yet to license this facility. I would ask the State not to move forward."[12]

51.    Mayor Turner's news conference marked the beginning of the City's deliberate efforts to prevent Southwest Key from opening the Casa Sunzal Shelter to house foreign national children.

52.    The same day, internal City correspondence shows that a "hard hold" was placed on all permitting in connection with the Shelter.[13]

---

[11] *Id.*
[12] *Id.*
[13] Email from M. McLeod RE 419 Emancipation Ave_ ILMS documents, June 19, 2018.

53.     On June 20, 2018, President Donald J. Trump issued an Executive Order stopping family separations at the border.[14] Family reunifications began soon thereafter. But that was not enough for Turner or the City: they continue to this day to do everything within and exceeding their legal authority to prevent the opening of the Casa Sunzal Shelter.

54.     On June 21, 2018, the City issued a press release in which Turner was quoted as saying:

> "It's hard for the City to grant approval when we don't know who's going to be there," the Mayor said of the [Casa Sunzal Shelter]. "The plan to proceed in housing children under this policy that was screwed up from the beginning is not going to go down well. You are not going to remove the stain."
>
> …
>
> "So when you start wrong, it's very difficult to get it right," Mayor Turner said of [Southwest Key's] approach.
>
> "The [ORR] gives the same classification of "unaccompanied minors" to children separated from their families and children who cross the border without adults, ORR officials said at the Tuesday meeting. Turner said that means there could be no way for Southwest Key to prevent itself from housing children seized from adult relatives by federal agents."
>
> …
>
> "To say that others are doing it and therefore this should be okay doesn't satisfy me", the Mayor responded.
>
> "If Southwest Key and property owner, David Denenburg, proceed with their plans, **City departments will conduct meticulous permitting inspections of the unused building "once we known who is going to be there" to see if the building can be used to house children, the Mayor explained.**"[15]

Southwest Key has always been up-front with the City about "who is going to be there": The

Casa Sunzal Shelter is a residential facility intended to house children. They are to be housed

---

[14] Exec. Order No. 13841, 83 Fed. Reg. 29435 (Jun. 25, 2018).

[15] Mayor's Office Press Release: During Uncertainty About Treatment of Migrant Infants and Children, Mayor Calls for Abandonment of Plan to House Them in Houston, June 21, 2018, available at: http://www.houstontx.gov/mayor/press/abandon-plan-housing-children-houston.html (last visited August 30, 2018) (emphasis added).

there without any locked exits or other physical restrictions on egress. The Casa Sunzal Shelter is not a "detention facility" as publicly claimed by the City.

55.     The day after Turner alluded to City harassment through "meticulous permitting inspections",[16] on June 22, 2018, the City requested "clarification" on the proposed use of the Casa Sunzal Shelter.

56.     The City was fully aware of the financial impact its tactics were having on Southwest Key, and that it might become unfeasible for Southwest Key to open the facility due to the City's bad faith actions.

57.     On June 29, 2018, the Mayor's Communications Director reiterated the Mayor's opposition to the Casa Sunzal Shelter in an interview with Texas Monthly magazine.[17] "When you have a policy that is immoral, inhumane, and against decency and common values, you can either chose to resist it or you can choose to enable it, … [Turner], as the Mayor of the City, was not going to be an enabler."[18]

58.     On July 2, 2018, Southwest Key requested a food service inspection from the City in order to obtain a food service permit for the Casa Sunzal Shelter. The City's food department has refused to conduct an inspection. Upon information and belief, this refusal is due to the City's publicly-stated determination not to let Casa Sunzal operate.

59.     On July 31, 2018, Southwest Key hosted a tour of the Casa Sunzal Shelter for elected officials. Southwest Key was also continuing its efforts to obtain a license from the State of Texas. Turner issued the following statements on Twitter:

---

[16] *Id.*
[17] Battle Over Houston Child Detention Facility Heats Up, TexasMonthly, June 29, 2018, available at: https://www.texasmonthly.com/news/battle-houston-child-detention-facility-heats/ (last visited August 30, 2018).
[18] *Id.*

> There are reports tonight that a @SouthwestKey detention center will open next week at 419 Emancipation. @HoustonFire has NOT inspected or issued an operational permit. I oppose the facility.[19]

And:

> More on @SouthwestKey's plan, which I oppose, to detain migrant children downtown: City Fire Safety permit they circulated to news media tonite [sic.] doesn't fit such an operation, @FireChiefofHFD says. They need, but haven't sought, 1 for a detention center #KeepFamiliesTogether.[20]

60.     In an effort to justify the Mayor's pretextual conduct, the City wrongfully described the Casa Sunzal Shelter as a "detention facility", despite its knowledge of other similar shelter facilities operating throughout the City of Houston which the City treats as residential facilities and does not hold to "detention center" standards, and despite there being no way in which children would be "detained" at Casa Sunzal under any legal or lay definition of that term.

61.     In fact, an internal City memorandum—received by Mayor Turner six weeks before he used that inflammatory term—explicitly states that the Casa Sunzal Shelter is not a detention center.[21] That memorandum describes the would-be-occupants as in "quasi foster care," and acknowledges that ORR places the children in "**residential** facilities, partly through contracts with [Southwest Key.]"[22]

62.     Also on July 31, the City issued a statement to the media saying in part:

> This six-week-old permit provided to you by Southwest Key states that it is for a shelter.
>
> However, that outmoded description of the use of the building—a description provided to HFD from Southwest Key—is not the appropriate classification for the intended use, according to Fire Chief Sam Peña.
>
>  As he explains, a shelter is a place where children live with their guardians, can come and go as they please and do not have to be separated by gender. In

---

[19] @SylvesterTurner, Twitter (Jul. 31, 2018, 10:15 PM),
https://twitter.com/SylvesterTurner/status/1024478573267234816.
[20] @SylvesterTurner, Twitter (Jul. 31, 2018, 11:31 PM),
https://twitter.com/SylvesterTurner/status/1024497919670603777 (internal links omitted).
[21] SKW (1).doc emailed by A. Bernstein to Mayor Turner on June 17, 2018 at 3:26 pm.
[22] *Id*.

contrast, [Southwest Key] publicly stated plan for the [Casa Sunzal Shelter], under contractual obligation to the federal government, is to house children without their guardians, thus making them wards of the government, to detain the children without their parents and to separate them by gender. This will require indoor design, equipment and other aspects that are for a detention facility – not a shelter. It will require a fire safety permit as an institution, detention center – not a shelter.

According to Peña, [Southwest Key] will have to go back to step 1 and get a building permit that has to be issued by Public Works. Only after Pubic Works issues such a permit will the fire department be able to inspect the facility to decide if it will provide the appropriate fire, safety and building occupancy permits. As previously mentioned, Health Department permit would also be required for food service. All of these processes are on hold according to Fire and Public Works.[23]

63.    The City points to no code or regulation which limits the definition of a "shelter" to "a place where children live with their guardians." By making up these rules and definitions as it goes along, the City has made clear its intent to wrongfully and discriminatorily classify the Casa Sunzal Shelter as a "detention center," to impose additional requirements upon Southwest Key which are not imposed on similar facilities located in the City, and to place a hold on all permitting processes including the necessary Health Department food permit.

64.    On August 1, 2018, officials from three different City departments, Public Works, the Houston Fire Department, and the Houston Health Department held a joint news conference stating that the previously-issued occupancy permit for the Casa Sunzal Shelter was invalid because, they claimed, the proposed use for Southwest Key was as an "institutional type" of facility.[24] In essence, the City was attempting to force Southwest Key to comply with the same Building Code requirements imposed upon a jail. The officials also claimed there were

---

[23] *See* Houston Detention Center for Migrant Children Does Not Have Proper Permits, Officials Say, July 31, 2018, available at: https://www.click2houston.com/news/detention-center-for-migrant-children-inches-closer-to-opening (last visited August 30, 2018).

[24] Officials Discuss Lack of Permits for Houston Detention Center, August 1, 2018, available at https://www.click2houston.com/video/officials-discuss-lack-of-permits-for-houston-detention-center (last visited August 30, 2018).

requirements to partition the building and separate the children by age and gender, requirements which are nowhere present in the Building Code. During that news conference, the Director of the Houston Public Works, Carol Haddock, stated that:

> There is a Certificate of Occupancy in place for the [Casa Sunzal Shelter] for a residential use. The residential use was issued in early June and that was issued based on a transient residential use. That is more like a hotel, a motel, or a shelter.
>
> …
>
> We responded to Southwest Key that unaccompanied minors and the intended use did not have a Certificate of Occupancy … and that they would be required to submit plans and be required to go through the permitting process that included not just Public Works but includes our colleagues in the Fire Department and our colleagues in the Health Department for an institutional Certificate of Occupancy.[25]

At that same news conference, Fire Chief Samuel Peña stated:

> The Certificate of Occupancy that is in place now was for a R1, a residential group, the last use of that facility was for the Star of Hope shelter, that would have been appropriate for the current Certificate of Occupancy. The intended use by the applicant now… has changed those parameters. They are going to house… over 200 children that are unaccompanied, they are going to be in a supervised environment, they are … essentially … not free to … roam the City without accompaniment of the state … so the facility use changes. Because of these new parameters, these new classifications would be an institutional type of facility.
>
> . . .
>
> The safety survey that was approved on June 14, right, from the fire department. That safety survey was based on the current Certificate of Occupancy as a residential R1 shelter-type facility.[26]

65.     Again, the distinction the City attempts to draw is one with no legal relevance, That the children are "unaccompanied" and are "supervised" is irrelevant to the use and occupancy

---

[25] *Id*.
[26] *Id*.

classification of the Shelter.[27] While the rules of Casa Sunzal do not permit occupants to "roam the City," there are no physical restraints preventing them from doing so, and it is these physical restraints—or lack thereof—which determine the use classification under the Building Code.

66.     On August 3, 2018, the City sent a letter to Southwest Key reiterating its previous media stances that the previously issued Certificate of Occupancy was for a Group "R1" Occupancy (Residential) and was invalid because the intended use required a Group "I" Institutional Occupancy as a "detention facility."

67.     While this letter, and other statements made by the City have loosely pointed to the fact that the planned occupants of the Casa Sunzal Shelter will be unaccompanied minors as the reason for the changed classification, in no public or official correspondence has the City explained the legal pertinence of this fact. Given that the facility has no locked or remote-controlled exits, the City has not identified any fact which would make an Institutional detention center classification appropriate.

68.     This August 3rd letter also expanded and escalated the City's unlawful campaign against Southwest Key by demanding access to Southwest Key's other Houston facilities for the purpose of conducting pretextual inspections so as to allow the City to wrongfully interfere with the operations of those facilities as well.

69.     At the same time, the City also acted to interfere with the issuance of the State GRO license for the Casa Sunzal Shelter by contacting the State of Texas and falsely informing the licensing authority that the Casa Sunzal Shelter did not have a valid Certificate of Occupancy and that the previously issued Certificate of Occupancy had been revoked. The City's Fire Chief,

---

[27] The City's complaints that the children are, on the one hand, "unaccompanied" and on the other are "supervised" seem mutually exclusive highlighting again the pretextual nature of the City's actions.

Samuel Pena, subsequently sent a letter dated August 16, 2018, to the State of Texas asserting that the Casa Sunzal Shelter had an invalid Certificate of Occupancy, even though no formal procedure for revocation of a Certificate of Occupancy had taken place.

70.     As a result of the City's letter and communications, the State has not issued the GRO license which Southwest Key needs in order to operate the Casa Sunzal Shelter.

71.     On August 30, 2018, Southwest Key received a call from a representative of the State licensing board informing it that if Southwest Key did not withdraw its application for a license, the State would move forward with a formal denial based on the City's actions. The State representative made clear that the reason it had not approved the license, and would be denying it, was the claims the City made about the Shelter allegedly not having a valid certificate of occupancy or fire permits. Faced with either a denial of the State license (which could impact Southwest Key's other facilities) or withdrawing its application for Casa Sunzal, Southwest Key was forced to withdraw its application. Southwest Key resubmitted that application the first week of September. However, on September 7, 2018, the State informed Southwest Key that the License application would not be processed or reviewed because the City sent a letter stating that Southwest Key's permits were revoked and were not valid.

72.     The City has also continued its harassment of Southwest Key with respect to Southwest Key's other Houston facilities, including contending that one other facility (known as the "La Concha" facility) has an invalid Certificate of Occupancy and invalid permits. The La Concha facility has operated for many years housing children under a Residential use classification and Certificate of Occupancy, including, upon information and belief, as the former location for the Ronald McDonald House Houston.

73. On August 24, 2018, a City Health Inspector demanded to inspect the grease traps at Casa Sunzal. The City had inspected these brand-new grease traps two months prior, and knows that—because the City has been holding up the issuance of its licenses, including its Health Department food permit—Casa Sunzal has not been operational, and thus has not had occasion to use its kitchen. Mayor Turner's stated plan, of throwing up every conceivable roadblock to Casa Sunzal operating as it is required to by ORR, is in full effect.

74. ORR has informed Southwest Key that if it does not begin operation of the Casa Sunzal Shelter by October 28, 2018, ORR will defund the program and thereby terminate its contract with Southwest Key.

75. Remarkably, the City's improperly-motivated course of conduct towards Southwest Key is not directed toward any of the other numerous youth shelters operated within the city limits housing minors under residential Certificates of Occupancy. This has resulted in improper discriminatory conduct toward Southwest Key and/or has had a disparate impact on Southwest Key. The City's open and obvious hostility towards Southwest Key demonstrates the futility of any efforts to satisfy City officials. The City has targeted Southwest Key in this improper political exercise, and this hostile course of conduct cannot be changed absent court intervention.

F. **The Harm to Southwest Key Caused by the City's Discriminatory Classification**

76. Classification of the Casa Sunzal Shelter as having Institutional, rather than Residential, use is not just a minor technicality. This change in classification requires both significant structural changes to the Shelter and the submission of plans and enormous amounts of additional paperwork to the City for approval which, as the City has clearly demonstrated, will never be forthcoming.

77.     The City itself, in an email, has acknowledged that it will take "time and expense" to bring the building up to the Institutional occupancy requirements, and that this may render the entire enterprise economically unfeasible.[28]

78.     Even if Southwest Key could a) afford, and b) find the manpower to perform, the significant structural changes in the short time available, Southwest Key is at the mercy of the City to approve these changes and all the materials Southwest Key must submit, and re-issue the various licenses.

79.     The City has made clear its intent to slow-walk any approvals and licensing, both through its words and through its actions to date. The City has further made clear its intent to search high and low for any possible technical defect that it might be able to find—defects it would normally allow to slide—as a basis for rejecting submitted plans and other documents.

80.     If the City is permitted to continue to discriminatorily insist that housing unaccompanied alien minors requires an Institutional use classification, Casa Sunzal will not be able to open its doors, and will lose its federal grant.

81.     This will result in millions of dollars in damages. To date, Southwest Key has invested roughly $3 million into Casa Sunzal, much of which will be unrecoverable if it cannot operate the shelter. It will also result in the loss of jobs for employees of the facility.

82.     Southwest Key's future liabilities in connection with Casa Sunzal are estimated to exceed $5 million. Again, most of these liabilities, such as the building lease and taxes, cannot be avoided and so will be incurred even if Southwest Key cannot operate the Shelter.

83.     Additionally, and as discussed further below, the loss of a federal grant by defaulting on the terms of that grant will cause significant irreparable harm to Southwest Key.

---

[28] Email from R. Mann RE Application for occupancy 419 Emancipation, June 27, 2018.

**G. The City Allows Other Shelter Facilities Housing Children to Operate with a Residential Permit**

84.     Multiple facilities in Houston house unaccompanied children on a non-permanent basis.

85.     Upon information and belief, some or all of these facilities operate under a Residential use classification.

86.     The City is requiring Casa Sunzal to operate under a different—and more burdensome—use classification than these other facilities for no reason other than the race, color, national origin, alienage, and/or immigration status of its occupants. This is unlawful and is causing Southwest Key significant irreparable harm.

## V.   CAUSES OF ACTION

**A. Fair Housing Act, 42 U.S.C. 3601 et seq.**

87.     Plaintiff realleges and incorporates herein all preceding paragraphs.

88.     Defendant's conduct, as set forth above, made housing unavailable on the basis of race, color, or national origin, in violation of the Fair Housing Act.

89.     Plaintiff is an aggrieved person as defined in 2 U.S.C. §§ 3602(d), has been injured by Defendant's unlawful conduct, and has suffered and continues to suffer damages as a result.

90.     Defendant's unlawful conduct was intentional, willful, and made in disregard of others. Additionally or alternatively, Defendant's conduct has had a disparate impact on Southwest Key as a member of a protected class.

**B. 42 U.S.C. 1983 and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution)**

91.     Plaintiff realleges and incorporates herein all preceding paragraphs.

92.     Defendant's conduct as set forth above constitutes unconstitutional discrimination against unaccompanied children on the basis of race, color, national origin, alienage, and/or

immigration status in violation of 42 U.S.C. § 1983 and the Equal Protection Clause of the United States Constitution.

93.     Plaintiff has been injured by Defendant's discriminatory and unconstitutional conduct and has suffered, and continues to suffer, damages as a result.

94.     Defendant's unlawful conduct was intentional, willful, and made in disregard of others. Additionally or alternatively, Defendant's conduct has had a disparate impact on Southwest Key as a member of a protected class.

### C. Due Process Clause of the U.S. Constitution

95.     Plaintiff realleges and incorporates herein all preceding paragraphs.

96.     The Due Process Clause of the 14th Amendment provides in relevant part, that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV.

97.     The City is a "State" as that term is used in the 14th Amendment.

98.     Southwest Key is a "person" as that term is used in the 14th Amendment.

99.     Clear procedures exist in law for the City to follow if it wishes to revoke a Certificate of Occupancy. Instead of following these procedures, the City is engaged in pretense and a misinformation campaign to prevent the Casa Sunzal Shelter from operating and housing needy children. In alleging—with no legal basis—that Casa Sunzal must be certified based on Institutional—rather than Residential—use, by asking the State to withhold issuance of its license on this false basis, and by using all other means at its disposal to harass Southwest Key, the City has denied Southwest Key its property without due process, in violation of the U.S. Constitution.

100.    Plaintiff has been injured by Defendant's discriminatory and unconstitutional conduct and has suffered, and continues to suffer, damages as a result.

101.    Defendant's unlawful conduct was intentional, willful, and made in disregard of others.

**D.  Supremacy Clause of the U.S. Constitution**

102.    Plaintiff realleges and incorporates herein all preceding paragraphs.

103.    The Supremacy Clause provides in relevant part, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . ." U.S. CONST. Art. VI, Cl. 2.

104.    Under the Supremacy Clause, a city may not expressly restrict or prohibit the operations of the federal government within its territory, nor may it take any other action aimed at or motivated by preventing the federal government from carrying out its duties, operations, policies, or practices within the city's territory, through contractors or otherwise.

105.    The City's actions and decisions to prevent Southwest Key from operating housing for unaccompanied children in Houston were substantially motivated by hostility to federal law, policy, or practice, including but not necessarily limited to federal immigration law and policy.

106.    As a result, the City's actions and decisions to prevent Southwest Key from operating in Houston violated the Supremacy Clause by: (a) discriminating against a federal contractor due to its fulfillment of federal policy; (b) improperly interfering with the federal government's exercise of its legal duty to care for unaccompanied children through contracting with qualified entities such as Southwest Key; (c) invading a field exclusively occupied by the federal government; and/or (d) frustrating the accomplishment of federal policy.

**E.  Declaratory Action**

107.    Plaintiff realleges and incorporates herein all preceding paragraphs.

108.    The City alleges that the Casa Sunzal Shelter should be deemed an Institutional facility pursuant to the Building Code and that it is a detention facility.

109.    This allegation appears to be based on the false assertion that there is restricted egress from the facility.

110.    Without restricted egress, there is no legal basis for classifying this facility and its intended use as Institutional.

111.    Instead, Casa Sunzal should be classified as a Residential facility.

112.    Southwest Key asks the Court to declare that:

    a)  There is no restricted egress from Casa Sunzal;

    b)  Without restricted egress, there is no basis for categorizing Casa Sunzal as an Institutional facility pursuant to the Building Code; and

    c)  Casa Sunzal in its intended use to house unaccompanied minors is a Residential facility pursuant to the Building Code.

**F.  Injunctive Relief: Request for Preliminary Injunction**

113.    Plaintiff realleges and incorporates herein all preceding paragraphs.

114.    Plaintiff will suffer irreparable injury if the City continues to: maintain that Casa Sunzal is an Institutional facility; claim that the previously issued Certificate of Occupancy and fire permits are invalid; interfere with and discourage the State from issuing a GRO license to Southwest Key on this basis; take hostile and harassing actions toward Southwest Key including unannounced inspections of Southwest Key facilities; and attack the legitimacy and validity of other Southwest Key location permits and occupancy certifications.

115.    The only reason the State has not issued a GRO license to Southwest Key is that the City is discouraging it from doing so, on the false pretense that Casa Sunzal's permits are invalid and have been revoked.

116.    Without a State GRO license, Southwest Key cannot operate Casa Sunzal. ORR has informed Southwest Key that if it does not begin operation of the Casa Sunzal Shelter by October 28, 2018, ORR will defund the program.

117.    In addition to the multi-million-dollar loss Southwest Key would incur as a result of this termination, Southwest Key would suffer the irreparable harm that comes with failing to fulfill a federal grant.

118.    This loss of potential profits from a government grant constitutes irreparable harm. *See BINL, Inc. v. United States*, 106 Fed. Cl. 26, 49 (2012) (loss of profits from a federal contract constitutes irreparable harm). Additionally, the reputational harm and the impact this failure to fulfill the grant will have on Southwest Key's ability to secure future federal grants are irreparable harms.

119.    Since the City is not just threatening Southwest Key's Casa Sunzal Shelter, but also its La Concha facility by falsely claiming that they must be certified as Institutions, the City's continued behavior puts Southwest Key's entire relationship with ORR at risk.

120.    The October 23rd deadline imposed by ORR renders this harm imminent, and the devastating impact that failing to fulfill the grant requirements would have to Southwest Key would be irreparable.

121.    There is no adequate remedy at law because once ORR terminates its grant to Southwest Key as a result of the City's actions, this will impact not only Southwest Key's recovery

on this program, but will impact Southwest Key's future attempts at receiving additional grants from the federal government in a definite, but unquantifiable, manner.

122.    There is a substantial likelihood that Southwest Key will prevail on the merits. As explained above, there is no factual or legal basis for the City's insistence that Casa Sunzal—in contrast to a whole host of facilities which house non-immigrant children—be designated as an Institution or detention facility.

123.    The only reason the City is claiming the facility must be certified for Institutional use is because it knows that Southwest Key cannot comply with the requirements for this certification in the limited time available to it, and preventing Southwest Key from operating the Shelter achieves the City's discriminatory goal of preventing the housing of unaccompanied immigrant children in Houston. This is an unambiguous violation of Southwest Key's rights.

124.    The harm faced by Southwest Key greatly outweighs the harm that would be sustained by the City if the preliminary injunction were granted. Whereas Southwest Key will suffer significant financial harm and immeasurable and irreparable harm due to the loss of its federal grant, enjoining the City from maintaining that Casa Sunzal requires Institutional use certification to operate will cause the City no harm at all.

125.    Issuance of a preliminary injunction will not adversely affect the public interest. The public has an interest in ensuring that children within our borders—regardless of nationality or immigration status—are safe and well-taken-care-of. Housing them at Casa Sunzal, where children have been housed for decades, with Casa Sunzal meeting all the requirements of a Residential facility, advances this pressing public interest. Imposing the requirements of an improper classification on Casa Sunzal will not make the children—or the public—safer.

126.    Southwest Key is willing to post a bond in the amount the Court deems appropriate.

127.     Southwest Key asks the Court to set its application for preliminary injunction for hearing at the earliest possible time and, after hearing the request, to issue a preliminary injunction against the City, ordering it to:

a)  Cease and desist from alleging that Casa Sunzal must be certified for Institutional use pursuant to the Building Code;

b)  Not 'red tag' the Shelter or otherwise alter, revoke, or take steps toward revocation of, any City license issued to the Shelter without approval of the Court;

c)  Inform the State that Casa Sunzal is fully certified for Residential use pursuant to the Building Code and that the City will not be altering, revoking, or taking steps toward revocation of any City license except with approval of the Court; and

d)  Cease and desist from inspections of Southwest Key facilities, requests for documents or evidence pertaining to Southwest Key facilities, and all other actions relating to Southwest Key facilities except those required for periodic re-certification or re-issuance of licenses.

## G. <u>Injunctive Relief: Request for Permanent Injunction</u>

128.     Plaintiff realleges and incorporates herein all preceding paragraphs.

129.     Southwest Key asks the Court to set its application for injunctive relief for a full trial on the issues in this application and, after the trial, to issue a permanent injunction against the City, ordering it to:

a)  Cease and desist from alleging that Casa Sunzal must be certified for Institutional use pursuant to the Building Code;

b)  Not 'red tag' the Shelter or otherwise alter, revoke, or take steps toward revocation of, any City license issued to the Shelter without approval of the Court;

c) Inform the State that Casa Sunzal is fully certified for Residential use pursuant to the Building Code and that the City will not be altering, revoking, or taking steps toward revocation of any City license except with approval of the Court; and

d) Cease and desist from inspections of Southwest Key facilities, requests for documents or evidence pertaining to Southwest Key facilities, and all other actions relating to Southwest Key facilities except those required for periodic re-certification or re-issuance of licenses.

## VI.  REMEDIES AND PRAYER

130. For these reasons, Southwest Key asks the Court to award recovery against the City for:

a) Compensatory damages in the amounts of at least:

   i. $3.3 million in operating expenses Southwest Key has incurred to date; and

   ii. $5.3 million in future liabilities Southwest Key will incur.

b) Exemplary damages in the maximum amounts allowed for each cause of action set forth above;

c) Pre-judgment and post-judgment interest;

d) Attorneys' fees; and

e) Cost of court.

131. Further, Southwest Key asks the Court to issue a preliminary injunction and a permanent injunction against the City, ordering it to:

f) Cease and desist from alleging that Casa Sunzal must be certified for Institutional use pursuant to the Building Code;

g) Not 'red tag' the Shelter or otherwise alter, revoke, or take steps toward revocation of, any City license issued to the Shelter without approval of the Court;

h)  Inform the State that Casa Sunzal is fully certified for Residential use pursuant to the Building Code and that the City will not be altering, revoking, or taking steps toward revocation of any City license except with approval of the Court; and

i)  Cease and desist from inspections of Southwest Key facilities, requests for documents or evidence pertaining to Southwest Key facilities, and all other actions relating to Southwest Key facilities except those required for periodic re-certification or re-issuance of licenses.

132.    Southwest Key asks the Court to enter judgment for Southwest Key on all counts, and to grant any other relief it deems appropriate.

Respectfully submitted,

**Buck Keenan LLP**

By: */s/ J. Robin Lindley*
J. Robin Lindley
State Bar No. 12366100
SDTX Bar No. 9693
lindley@buckkeenan.com
2229 San Felipe, Suite 1000
Houston, Texas 77019
(713) 225-4500
(713) 225-3719 (fax)

**ATTORNEY-IN-CHARGE FOR
SOUTHWEST KEY PROGRAMS, INC.**

**OF COUNSEL**
Laura Gleen
State Bar No. 24085329
SDTX Bar No. 1673869
lgleen@buckkeenan.com
2229 San Felipe, Suite 1000
Houston, Texas 77019
(713) 225-4500
(713) 225-3719 (fax)